AO 106A  (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | | |
|---|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Gray and Black, Removable Thumb Drive seized on<br>October 6, 2025 from 510 National City Blvd, National<br>City, CA (Target Device 5) | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No.   25-mj-05534 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-5, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-5, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

❒ property designed for use, intended for use, or used in committing a crime;

❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1201, 1591, 2251, 2252, 2252A, 2422, and 2423 | Kidnapping, Attempted Sex Trafficking of a Minor, Attempted Sex Trafficking by Force and Coercion, Production of CSAM, Possession of CSAM, Activities Related to CSAM, Coercion and Enticement, and Transportation w Intent |

The application is based on these facts:

See affidavit of Special Agent Samantha Hix, incorporated herein by reference.

☑ Continued on the attached sheet.

❒ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Samantha Hix*
*Applicant's signature*

Samantha Hix, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date: _____10/09/2025_____

*Judge's signature*

City and state:  San Diego, CA

Hon. Steve B. Chu, United States Magistrate Judge
*Printed name and title*

## <u>AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT</u>

I, Samantha Hix, Special Agent with the Federal Bureau of Investigation, being duly sworn, hereby states as follows:

### INTRODUCTION

1. I make this affidavit in support of an application for a search warrant to search the following electronic devices, as described in Attachments A-1 through A-5, and seize evidence of crimes, specifically, violations of 18 U.S.C. § 1201 (Kidnapping), 18 U.S.C. § 1591 (Attempted Sex Trafficking of a Minor), 18 U.S.C. § 1591 (Attempted Sex Trafficking by Force, Fraud, or Coercion), 18 U.S.C. § 2251 (Sexual Exploitation of Children), 18 U.S.C. § 2252 (Materials Involving the Sexual Exploitation of Minors), 18 U.S.C. § 2252A (Activities Related to Materials Involving the Sexual Exploitation of Minors), 18 U.S.C. § 2422 (Coercion and Enticement of a Minor), and 18 U.S.C. § 2423 (Transportation to Engage in Criminal Sexual Activity), as more particularly described in Attachments B-1 through B-5:

    A. Blue, Motorola Android seized on October 6, 2025 from 1401 Broadway St, San Diego, CA (**Target Device 1**)

    B. Black, Motorola Android seized on October 6, 2025 from 510 National City Blvd, National City, CA (**Target Device 2**);

    C. Blue, Motorola Android seized on October 6, 2025, from 510 National City Blvd, National City, CA (**Target Device 3**);

    D. Black, Canon XA10 HD Camcorder seized on October 6, 2025 from 510 National City Blvd, National City, CA (**Target Device 4**);

    E. Gray and Black, Removable Thumb Drive seized on October 6, 2025 from 510 National City Blvd, National City, CA (**Target Device 5**);

This search supports an investigation conducted by the Federal Bureau of Investigation (FBI), in conjunction with the San Diego Human Trafficking Task

1

Force (SDHTTF), into Randy Robert CHATTANS (**CHATTANS**) for the above-described violations. A factual explanation supporting probable cause follows.

2.      **Target Device 1** was seized on October 6, 2025, during the recovery of Juvenile Female ("JF") by San Diego Police Department (SDPD).  **Target Device 1** is currently in the possession of SDHTTF, 9425 Chesapeake Drive, San Diego CA. **Target Device 2** was seized on October 6, 2025, during a subsequent search of CHATTANS vehicle, in a backpack in the trunk of the car. **Target Device 2** is currently in the possession of SDHTTF, 9425 Chesapeake Drive, San Diego CA. **Target Device 3** was seized on October 6, 2025, on CHATTANS person when he was searched by law enforcement. **Target Device 3** is currently in the possession of SDHTTF, 9425 Chesapeake Drive, San Diego, CA. **Target Device 4** was seized on October 6, 2025, during a subsequent search of CHATTANS vehicle, in the trunk of the car. **Target Device 4** is currently in the possession of the SDHTTF, 9425 Chesapeake Drive, San Diego, CA. **Target Device 5** was seized on October 6, 2025, during a subsequent search of CHATTANS vehicle, in a shoebox in the trunk of the car. **Target Device 5** is currently in the possession of the SDHTTF, 9425 Chesapeake Drive, San Diego, CA.

3.      Based on the information below, there is probable cause to believe that a search of the **Target Devices** will produce evidence of the aforementioned crimes, as described in Attachments B-1 through B-5.

4.      The information set forth in this affidavit is based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of obtaining search warrants for the

**Target Devices**, it does not set forth each and every fact that I or others have learned during the course of this investigation, but only contains those facts believed to be necessary to establish probable cause.

## EXPERIENCE AND TRAINING

5.     I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Titles 18 and 21 of the United States Code.

6.     I am a Special Agent (SA) employed by the Federal Bureau of Investigation (FBI). I am a graduate of the 18-week FBI academy and I have been employed as a SA since April of 2023. I have been trained to conduct criminal investigations for multiple violations of federal and state laws including, but not limited to alien smuggling and narcotics smuggling, human trafficking, narcotics trafficking, and organized criminal activity.

7.     Since September of 2025, I have been assigned to the San Diego Human Trafficking Task Force (SDHTTF) where I have participated in investigations involving the exploitation of children and adults for illicit commercial sex activity, human trafficking, forced labor, various illegal activities of criminal gang members and have performed a variety of related investigative tasks.

8.     My experience as an FBI Special Agent has included the investigation of cases involving the use of computers and the internet to commit crimes. I have received training and gained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer evidence seizure and processing, and various other criminal laws and procedures. I have personally participated in the execution of search

3

warrants involving the search and seizure of cellular telephones and other electronic devices.

9.    Through my training, experience, and consultation with other law enforcement officers, I have learned that:

a.    Individuals involved in illicit commercial sex maintain records, including electronic files, related to their illicit purchases on computers and computer servers hosting internet applications such as electronic mail (email) and personal social networking web pages;

b.    Individuals involved in illicit commercial sex often seek commercial sex services through electronic advertisements and other media, such as Craigslist, MegaPersonals, Skipthegames, and other social media sites accessed on cellular telephones and computers;

c.    Individuals involved in illicit commercial sex maintain records of correspondence relating to contact information as well as travel and lodging arrangements involved in such illegal activity;

d.    Individuals involved in illicit commercial sex maintain financial records, bank statements, money orders, money order receipts, and cash that are evidence of payments made in conjunction with prostitution;

f.    Individuals involved in illicit commercial sex use cellular telephones, tablet, desktop, removable hard drives and flash drives, and notebook computers and maintain these items on their person and/or in their residences and/or vehicles. Individuals involved in illicit commercial sex use cellular telephones, tablet, notebook computers, and removable storage media to increase their mobility and coordinate illicit activities. Individuals involved in illicit commercial sex will use multiple cellphones, tablets, notebook computers, phone numbers, and internet-

4

based messaging apps in order to maintain contact with commercial sex workers. These electronic devices contain wire and electronic data concerning telephonic contact records, text messages, and electronic mail messages with commercial sex workers, as well as telephone books containing contact information for commercial sex workers. Individuals involved in illicit commercial sex also utilize digital cameras, cellular telephones, desktop and notebook computers with photograph and video capabilities to take photographs and videos of themselves in response to verification requests from commercial sex workers. Moreover, I know that digital evidence can be stored on a variety of systems and storage devices including: hard disk drives, DVD ROMS, pagers, money chips, thumb drives, flash drives, and portable hard drives;

g.   Individuals involved in illicit commercial sex use social media sites like Facebook or Instagram to find commercial sex workers. They use messaging applications to communicate with commercial sex workers to increase their mobility and coordinate illicit activities. Individuals involved in illicit commercial sex will often use multiple social media accounts in order to maintain contact with commercial sex workers. These social media accounts contain electronic data concerning instant messaging, electronic mail and social media addresses of commercial sex workers.

10.   Based upon my experience and training, and the experience and training of other agents with whom I have communicated, the evidence of illegal activity described above in paragraphs "a" through "g" is maintained by individuals involved in illicit commercial sex in property that they and their associates live in

5

and operate as well as on online accounts including email accounts, which can be accessed on computers and cellular telephones.

## FACTS IN SUPPORT OF PROBABLE CAUSE

### *Introduction*

11.    During the course of my duties, I have learned the following information from reading the reports prepared by other officers or I have spoken with the victim or witnesses directly. All dates refer to the current calendar year and all times refer to Pacific Standard Time (PST) unless specified otherwise.

12.    On October 6, 2025, a 13 year old female was recovered by San Diego Police Department and interviewed by the SDHTTF. During the course of this interview, her trafficker was identified as CHATTANS, as explained herein.

### *Initial Recovery of JF and Arrest of CHATTANS*

13.    On October 6, 2025, at approximately 8:30 a.m., investigators from the SDHTTF were contacted after a SDPD Officer encountered a 13 year old female who had called the police from the Shell gas station located at 3890 Division St, San Diego, CA. During her initial interaction with law enforcement, JF stated that she had been brought to San Diego against her will and did not want to engage in commercial sex. JF had **Target Device 1** in her possession, as CHATTANS had confiscated her personal phone from her when she attempted to contact her mother and gave her one of his cell phones to use instead.

14.    On the same date, SA Hix, SDPD Det. D. Dierdorff, and California Highway Patrol (CHP) Det. Kimberly Buchholtz responded to SDPD Headquarters to interview the victim, her statement has been detailed below.

15.    Concurrently, at approximately 10:59 a.m., National City Police Department (NCPD) located and contacted CHATTANS as he approached National City Motel, 510 National City Blvd, National City, CA, and took him into custody on a warrant out of San Diego County and seized **Target Device 3**.

6

Investigators then learned that CHATTANS is on state probation and his room and vehicle were searched under the 4th waiver exception. Upon a search of his vehicle, investigators located **Target Devices 2, 4, and 5** in their aforementioned locations. From a cursory review of JF's personal phone, also recovered from CHATTANS's vehicle, investigators observed Instagram communications between JF and CHATTANS dating back to approximately September 30, 2025

*Interview of JF*

16.    On October 6, 2025, at approximately 10:00 a.m., SA Hix, SDPD Det. D. Dierdorff, and CHP Det. Kimberly Buchholtz conducted an interview with JF at SDPD headquarters. During the interview, JF confirmed that she was brought to San Diego for commercial sex work. JF confirmed her birth date of XX/XX/2011, which made her 13 years old at the time of the interview.  JF stated that she lived in Las Vegas, NV with her mother. JF had been walking from a train station with her friend "Mike," and when they parted ways, CHATTANS pulled up to JF in a vehicle. CHATTANS asked JF for her phone number, and they exchanged numbers. JF stated that CHATTANS later contacted her, and they met up in Las Vegas. During this meeting, CHATTANS initially tried to have JF do commercial sex work in Las Vegas, but JF refused. CHATTANS then asked JF if she still wanted to make some money, to which she agreed. JF entered CHATTANS vehicle and fell asleep.

17.    When JF woke up, she realized she was no longer in Las Vegas with CHATTANS. JF stated that she began crying and telling CHATTANS she wanted to go home, however he continued driving. When JF attempted to call her mother, CHATTANS took her phone. Upon arriving in San Diego, CHATTANS expected JF to make him at least $1,000.00. JF stated she and CHATTANS stayed at two different motels but only recalled the one she left from the morning of her recovery, the National City Motel. JF stated that she had no clothes to change into when she

7

arrived because she did not know she would be leaving Las Vegas. CHATTANS purchased JF new clothing in San Diego, which JF described as "hoe" clothing. CHATTANS would drop JF off at the Shell gas station mentioned previously and tell her to make him money, which JF stated meant CHATTANS expected her to engage in commercial sex. JF stated that she would walk up and down the street, but if she was approached by a "customer" she would run and hide. JF stated that CHATTANS would also bring customers to the motel room, but she would refuse to engage in commercial sex with them. JF stated that this angered CHATTANS, and that during the time she was at the motel with him he strangled her and hit her in the back of the head because she would not engage in commercial sex. CHATTANS himself had sex with JF twice.

18.    JF stated that she had been in San Diego with CHATTANS for approximately one week. The day prior to her recovery, JF stated that CHATTANS told her he would buy JF a plane ticket back to Las Vegas because she was not making him any money. However, that never occurred and JF stated CHATTANS held her "hostage." JF stated she was only able to contact her mother three times while she was with CHATTANS, and only over text message because he would not allow her to call. JF stated CHATTANS also altered or deleted her messages to her mother, and would deny JF access to her personal phone.

19.    During the interview, SA Hix observed that JF physically appeared to be approximately 13 years old. SA Hix also observed that JF's speech patterns and mannerisms were consistent with those of a young teenager. JF told investigators that CHATTANS never asked how old she was or for any identification. JF also told investigators that CHATTANS discussed having his two "older" girls in Los Angeles, CA and Las Vegas, NV.

20.    On October 6, 2025, investigators received lodging records from the National City Motel. These records showed that CHATTANS checked into the

8

motel on October 3, 2025, under a false identity. CHATTANS provided a Florida driver's license with the name "Andrew Sims," which upon the license number being run by motel staff came back to a "Payal L Trehan." During JF's recovery, she stated that CHATTANS drove a red two-door vehicle, and that he would likely still be in the area of the motel because she had taken all of the room keys with her. As mentioned previously in this affidavit, CHATTANS was subsequently located by law enforcement and taken into custody.

21.    Investigators located a phone number that CHATTANS had previously provided to California Highway Patrol and searched for commercial sex ads that utilized that phone number. Investigators located commercial sex ads for CHATTANS and others that were more than three years old, none of which included JF.

22.    On October 7, 2025, the Honorable Steve B. Chu, United States Magistrate Judge, issued search warrants for **Target Devices 1, 2, and 3**. On October 8, 2025, during the search of **Target Device 3** pursuant to the October 7, 2025 warrants, investigators observed a video of JF engaged in a sexual act that appeared to be taken inside CHATTANS's vehicle. Investigators continued searching **Target Devices 1, 2, and 3** for materials within the scope of the October 7, 2025 warrants. Investigators, however, ceased any additional searches of **Target Devices 1, 2, and 3** for evidence of child sex abuse material pending the issuance of additional search warrants.

23.    During the October 8, 2025 searches pursuant to the October 7, 2025 warrants, investigators also observed evidence of communications between JF and CHATTANS before September 22, 2025.

## METHODOLOGY FOR CELLULAR DEVICES

24.    It is not possible to determine, merely by knowing the mobile electronic device's make, model and serial number, the nature and types of services

9

to which the device is subscribed and the nature of the data stored on the device. Mobile electronic devices, including cellular telephones and tablets, can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers and installable software now allow for their subscribers and users to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many mobile electronic devices do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some mobile electronic device models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

25.    Following the issuance of these warrants, I will collect the **Target Devices** and subject them to analysis. All forensic analysis of the data contained within the **Target Devices** and their memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

10

26.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date this search warrant is signed, absent further application to this court.

**PROCEDURES FOR ELECTRONICALLY STORED INFORMATION AS TO COMPUTERS AND OTHER ELECTRONIC STORAGE DEVICES**

27.     With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures regarding computers and other electronic storage devices, including electronic storage media that may contain data subject to seizure pursuant to this warrant:

<u>Seizure and Retention of Instrumentalities</u>

a.     Based upon the foregoing, there is probable cause to believe that any computers and other electronic storage devices encountered during this search are instrumentalities of the enumerated offenses because there is probable cause to believe that they may contain contraband and fruits of crime as provided under Rule 41(c)(2), Fed. R. Crim. P., or were used in committing crime as provided under Rule 41(c)(3), Fed. R. Crim. P.  Consequently, the computers and any other electronic storage devices are subject to seizure, retention and possible forfeiture and destruction.  Computers, other electronic storage devices and media confirmed onsite to contain contraband constitute fruits of crime or to have been used to commit a crime will not be returned but will be imaged offsite and analyzed as provided beginning at subparagraph (c) below.  The onsite confirmation may be provided by an owner or user of the computer or storage device or, if feasible, may be obtained by conducting a limited onsite forensic examination to determine if the subject media contains any contraband or otherwise is an instrumentality.  Computers and other

11

electronic storage devices and media that are not confirmed onsite as instrumentalities will be taken offsite for imaging and preliminary analysis in accordance with subparagraph (b) below.

b. The offsite imaging and preliminary analysis of computers, other electronic storage devices and media to confirm their status as instrumentalities will be conducted within forty five (45) days of seizure. Seized items confirmed to be instrumentalities will not be returned and will be further analyzed as provided below. If the preliminary analysis, by definition an incomplete or partial analysis, does not confirm that a seized item is an instrumentality, the original item will be returned promptly to its owner, absent an extension of time obtained from the owner or from the court. An image of the items will be retained and subjected to a complete forensic analysis, as provided below.

c. Computers and other electronic storage devices and media that are retained as instrumentalities will not be returned to its owner. The owner will be provided the name and address of a responsible official to whom the owner may apply in writing for return of specific data not otherwise subject to seizure for which the owner has a specific need. The identified official or other representative of the seizing agency will reply in writing. In the event that the owner's request is granted, arrangements will be made for a copy of the requested data to be obtained by the owner. If the request is denied, the owner will be directed to Fed. R. Crim. P. 41(g).

<u>Identification and Extraction of Relevant Data</u>

d. A forensic image is an exact physical copy of the hard drive or other media. After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant. Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment and software. There are literally thousands of different hardware items and software programs, and different versions of the

same program, that may be commercially purchased, installed and custom-configured on a user's computer system.  Computers are easily customized by their users.  Even apparently identical computers in an office environment may be significantly different with respect to configuration, including permissions and access rights, passwords, data storage and security.  It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

e.    Analyzing the contents of a computer or other electronic storage device, even without significant technical issues, may be very challenging.  Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant hit does not end the review process.  The computer may have stored information about the data at issue: who created it; when and how it was created or downloaded or copied; when it was last accessed; when it was last modified; when it was last printed; and, when it was deleted. Sometimes it is possible to recover an entire document that never was saved to the hard drive if the document was printed.  Moreover, certain file formats do not lend themselves to keyword searches.  Keywords search text.  Many common electronic mail, database and spreadsheet applications do not store data as searchable text.  The data is saved in a proprietary non-text format. Documents printed by the computer, even if the document never was saved to the hard drive, are recoverable by forensic programs but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  Similarly, faxes sent to the computer are stored as graphic images and not as text.  In addition, a particular relevant piece of data does not exist in a vacuum.  To determine who created, modified, copied, downloaded, transferred, communicated about, deleted or printed the data requires a search of other events that occurred on the computer in

13

the time periods surrounding activity regarding the relevant data.  Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

f.      It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users which generally is not visible to users.  Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time.  In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time. The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user.  For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

g.      Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has become mind-boggling.  For example, a single megabyte of storage space is roughly equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent of 500,000 double-spaced pages of text.  Computer hard drives are now being sold for personal computers capable of

14

storing more than 2 terabytes (2,000 gigabytes) of data. And, this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer). The sheer volume of data also has extended the time that it takes to analyze data. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

h. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including the use of hashing tools to identify evidence subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as a known operating system and application files. The identification and extraction process may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred twenty (120) days from the date of seizure pursuant to this warrant, absent further application to this court.

i. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## GENUINE RISKS OF DESTRUCTION OF DATA

28. Based upon my experience and training, and the experience and training of other law enforcement agents with whom I have communicated, electronically stored data may be permanently deleted or modified by users possessing basic computer skills. In this case, CHATTANS is currently in custody so there appears to be a minimal risk regarding the destruction of evidence.

//

15

## PRIOR ATTEMPTS TO OBTAIN DATA

29.     As set forth in paragraphs 22 and 23 above, law enforcement has previously attempted to obtain some of the evidence sought by the instant warrants in the course of executing searches authorized by the October 7, 2025 warrants. For materials observed during those searches but outside the scope of the October 7, 2025 warrants, investigators now seek the instant warrants. Additionally, at the time of JF's recovery, she showed responding Officers photographs of CHATTANS from **Target Device 1**, as well as social media profiles for Instagram and Facebook. Once JF was brought back to SDPD HQ and it was determined the device belonged to CHATTANS, investigators did not attempt to obtain any evidence from the device.

## CONCLUSION

30.     Based on the foregoing, I submit there is probable cause to believe items that constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, 18 U.S.C. § 1201 (Kidnapping), 18 U.S.C. § 1591 (Attempted Sex Trafficking of a Minor), 18 U.S.C. § 1591 (Attempted Sex Trafficking by Force, Fraud, or Coercion), 18 U.S.C. § 2251 (Sexual Exploitation of Children), 18 U.S.C. § 2252 (Materials Involving the Sexual Exploitation of Minors), 18 U.S.C. § 2252A (Activities Related to Materials Involving the Sexual Exploitation of Minors), 18 U.S.C. § 2422 (Coercion and Enticement of a Minor), and 18 U.S.C. § 2423 (Transportation to Engage in Criminal Sexual Activity), as described in Attachments B-1 through B-3, will be found in the property to be searched, as described in Attachments A-1 through A-5.

//

//

//

//

16

31. I therefore respectfully request that this Court issue warrants authorizing me, an FBI Special Agent, or another law enforcement officer, to search the **Target Devices**, as described in Attachments A-1 through A-5 and seize the items listed in Attachments B-1 through B-5.

I swear the foregoing is true and correct to the best of my knowledge and belief.

*Samantha Hix*
Samantha Hix
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 9th day of October 2025.

_____
HONORABLE STEVE B. CHU
UNITED STATES MAGISTRATE JUDGE

17

**ATTACHMENT A-5**
**ITEM TO BE SEARCHED**

The property/items to be searched is/are described as follows:

Gray and Black, Removable Thumb Drive seized on October 6, 2025 from 510 National City Blvd, National City, CA (**Target Device 5**);

**Target Device 5** is currently being held at the SDHTTF Office located at 9425 Chesapeake Dr. San Diego, CA 92123.

**ATTACHMENT B-5**
**ITEMS TO BE SEIZED**

Authorization to search the USB described in Attachment A-5 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the USB. The seizure and search of the camcorder will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the camcorder will be electronic records, communications, and data such as emails, text messages, photographs, audio files, video, telephone numbers, contact information, web browsing history, documents, data stored within applications, and location data, for the period of September 1, 2025 through October 6, 2025:

(1) tending to indicate efforts to recruit, entice, harbor, transport, provide, obtain, or maintain a person for the purposes of engaging in a commercial sex act;

(2) tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers— used to facilitate human trafficking;

(3) tending to identify bank accounts and transactions involved in payments for commercial sex acts;

(4) tending to show efforts to advertise individuals on websites for commercial sex acts;

(5) tending to identify the transportation of individuals to, or presence at, locations used for commercial sex acts;

(6) tending to demonstrate the production and/or possession of sexually explicit images or videos of minors;

(7) tending to identify the user of, or persons with control over or access to, the subject phone; or

(8) tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data described above

which are evidence of violations of 18 U.S.C. § 1201 (Kidnapping), 18 U.S.C. § 1591 (Attempted Sex Trafficking of a Minor), 18 U.S.C. § 1591 (Attempted Sex Trafficking by Force, Fraud, or Coercion), 18 U.S.C. § 2251 (Sexual Exploitation of Children), 18 U.S.C. § 2252 (Materials Involving the Sexual Exploitation of Minors), 18 U.S.C. § 2252A (Activities Related to Materials Involving the Sexual Exploitation of Minors), 18 U.S.C. § 2422 (Coercion and Enticement of a Minor), and 18 U.S.C. § 2423 (Transportation to Engage in Criminal Sexual Activity).

The seizure and search of the USB shall follow the procedures outlined in the procedures for electronically stored information as to computers and other electronic storage devices section in the supporting affidavit. Deleted data, remnant data, slack space, and temporary and permanent files on the device may be searched for the evidence above.